AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Javier Antonio Hooker James, Uel Rincon Smith,<br>Guillermo Julio Gomez, and Eliseo Castillo Montero,<br><br>Defendant(s) | )<br>)<br>) Case No. 13-5015-SNOW<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 27, 2013__ in the county of __Monroe__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 46, United States Code, Section 70506(b) | Did knowingly and willfully conspire to possess with the intent to distribute a controlled substance, while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. 70503(a); all in violation of 46 U.S.C. 70506(b).<br><br>Pursuant to 46 U.S.C. 70506(a), and 21 U.S.C. 960(b)(1)(B)(ii), it is further alleged that this violation involved five kilograms or more of a mixture and substance containing a detectable amount of cocaine. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Daniel Perez, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/4/2013

*Judge's signature*

City and state: __Key West, Florida__ __Lurana S. Snow, United States Magistrate Judge__
*Printed name and title*

I, Daniel Perez, being duly sworn, hereby depose and state the following:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (hereinafter HSI), and have been so employed since February 2006. I am presently assigned the Office of the Special Agent in Charge Miami, Florida, where I am responsible for conducting narcotics smuggling investigations involving the use of marine vessels. As a special agent with HSI, I have participated in numerous narcotics investigations involving: physical and electronic surveillance; the control and administration of confidential sources; international drug importations; and domestic drug organizations. I have participated in the arrest and subsequent prosecution of numerous drug traffickers. I also have spoken on numerous occasions with informants, suspects, and experienced narcotics investigators concerning the manner, means, methods and practices that drug traffickers use to further the operation of their drug trafficking organizations and the most effective methods of investigating and dismantling drug trafficking organizations.

2. As a law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, I am empowered by law to conduct investigations of and make arrests for, but not limited to, offenses enumerated in Titles 18, 19, 21, 31 and 46 of the United States Code.

3. The information contained in this affidavit is submitted for the sole purpose of establishing probable cause to arrest Javier Antonio HOOKER JAMES, Uel RINCON SMITH, Guillermo Julio GOMEZ, and Eliseo CASTILLO MONTERO for violating Title 46, United State Code, Sections 70503(a)(1) and 70506(b), that is each did

knowingly and willfully conspire to possess with intent to distribute five kilograms or more of cocaine, while on board a vessel subject to the jurisdiction of the United States.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not contain all of the information known to me and other law enforcement officers involved in this investigation. The facts and information contained in this affidavit are based on my personal knowledge and observations, as well as upon information received in my official capacity from other individuals, including other law enforcement officers and sources involved in this investigation as well as my review of records, documents, and other physical items obtained during the course of this investigation.

5. On or about February 27, 2013, at approximately 02:00 AM local time, while on a routine patrol in the western Caribbean Sea, a United States marine patrol aircraft sighted a stateless go-fast vessel approximately twenty-three nautical miles northwest of the Serrana Bank, in international waters and upon the high seas, with four individuals on board. The go-fast vessel was observed to be approximately thirty feet in length, with a dark blue hull, and three outboard engines, heading in a southwesterly direction at a high rate of speed. The marine patrol aircraft crew observed numerous fuel drums and numerous bales on the deck of the go-fast vessel, which the go-fast vessel crew had attempted to secret under a tarpaulin. The crew on board the marine patrol aircraft radioed their observations to the United States Coast Guard Cutter *LEGARE*, which was on routine patrol in the area of the go-fast vessel.

6. Upon receiving the information from the marine patrol aircraft, the *LEGARE* launched one helicopter and one small boat for the purpose of identifying the go-fast vessel.

7. The United States Coast Guard helicopter pursued the go-fast vessel, and upon closing in, energized its law enforcement lights. In both English and Spanish, on Channel 16 and via the load hailer, the helicopter crew commanded the go-fast vessel to heave to. The go-fast vessel crew disregarded the helicopter crew's commands and continued to make way. Upon receiving authority to use warning shots, the helicopter crew fired a volley of warning shots behind the go-fast vessel in an effort to have the go-fast vessel heave to. The warning shots dissuaded the go-fast crew from making way, and the go-fast vessel went dead in the water of its own accord. At that time, the helicopter crew observed the go-fast vessel crewmembers jettison small items into the water.

8. Shortly thereafter, the Coast Guard small boat arrived to the go-fast vessel and conducted a right of visit boarding, in international waters. The Coast Guard boarding team confirmed that the go-fast vessel bore no indicia of nationality, in that it was not flying a flag or ensign nor were any other markings observed on the hull evidencing: home port, port of registry, or vessel registration numbers. Coast Guard identified the four crewmembers on board the go-fast vessel as: Javier Antonio HOOKER JAMES, Uel RINCON SMITH, Guillermo Julio GOMEZ, all citizens and nationals of Colombia, and Eliseo CASTILLO MONTERO, a citizen and national of Honduras.

9. Upon being asked, no crewmember identified himself as the captain of the go-fast vessel and no crewmember claimed a nationality for the go-fast vessel. Upon no claim of nationality being made by the crew and no documentation evidencing the vessel's

3

nationality being presented, the United States Coast Guard determined the go-fast vessel was a vessel without nationality and subject to the jurisdiction of the United States.

10. Upon boarding the go-fast vessel, a search was conducted. Upon searching the vessel, no documents were found on board evidencing the vessel's registration. However, upon searching the hold underneath the tarpaulin, Coast Guard discovered thirty-nine bales, which appeared to be narcotics packaged for maritime transport.

11. The four crewmembers and the thirty-nine bales were later transferred aboard the *LEGARE*. A field test conducted of the bales determined them to contain cocaine and weigh approximately 1,100 kilograms.

12. On March 4, 2013, Coast Guard arrived to Key West, Florida, where Javier Antonio HOOKER JAMES, Uel RINCON SMITH, Guillermo Julio GOMEZ, and Eliseo CASTILLO MONTERO first entered the United States. That same day, Coast Guard transferred custody of the four go-fast crew members and the 1,100 kilograms of cocaine to United States law enforcement officers.

13. Upon being advised of their *Miranda* warnings, each crewmember acknowledged that he understood his rights and waived his rights. Post-*Miranda*, CASTILLO MONTERO stated to law enforcement officers that he knowingly and willingly transported the cocaine, later discovered by the Coast Guard, on board the vessel for $50,000. He stated that he was paid $5,000 in advance and that this was his third narcotics trafficking trip. CASTILLO MONTERO advised that the vessel departed La Guajira, Colombia with the thirty-nine bundles of cocaine aboard and that they were destined for Honduras. CASTILLO MONTERO indicated that he was responsible for making sure the vessel reached its destination in Honduras. He further indicated that

4

HOOKER was in charge of the vessel and that RINCON SMITH and GOMEZ shared the responsibility of piloting the vessel.

14. Post-*Miranda*, GOMEZ stated that he knowingly and willingly transported cocaine, which was later discovered by the Coast Guard, for 75 million Colombian pesos, with 4 million Colombian pesos paid up front. He stated that the vessel departed La Guajira, Colombia with an unknown amount of cocaine on board and was destined for Honduras. GOMEZ indicated that he, along with RINCON SMITH, alternated piloting the vessel and that HOOKER was the navigator. He stated that this was his second narcotics trafficking.

15. Post-*Miranda*, HOOKER JAMES stated that he received a call one week prior to making the February 2013 narcotics trip. He stated the vessel was ready to go when he arrived to the vessel, and that they departed from La Guajira, Colombia headed for Honduras. HOOKER JAMES stated he was offered $175,000 to make the trip and he was paid approximately $25,000 up front. He indicated that he did not know how much cocaine was on board the vessel, but he estimated that it was approximately 1,000 kilograms. HOOKER JAMES indicated that CASTILLO MONTERO was in charge of the cocaine. HOOKER JAMES stated that this was his second narcotics trafficking venture and that he was paid $20,000 for the prior trip.

16. Post-*Miranda*, RINCON SMITH stated that he received a call one week prior to making the February 2013 narcotics trip. He was offered approximately $50,000 to make the trip and was given $7,500 up front. RINCON SMITH indicated that the vessel departed La Guajira, Colombia with the thirty-nine bales of cocaine on board and was destined for Honduras. RINCON SMITH stated that CASTILLO MONTERO was to be

transferred, along with the cocaine, to Honduran recipients. RINCON SMITH stated that HOOKER JAMES was in charge of the vessel.

17. Based on the foregoing facts, I submit that probable cause exits to believe that, Javier Antonio HOOKER JAMES, Uel RINCON SMITH, Guillermo Julio GOMEZ, and Eliseo CASTILLO MONTERO, while on board a vessel subject to jurisdiction of the United States, did knowingly and willfully conspire to possess with the intent to distribute a controlled substance, that is five kilograms or more of cocaine, in violation of Title 46, United States Code, Sections 70503(a)(1) and 70506(b).

FURTHER AFFIANY SAYETH NAUGHT.

_____
DANIEL PEREZ, SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Sworn to and subscribed before
me this 7th day of March, 2013.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

6